**LATINO OFFICERS ASSOCIATION
CITY OF NEW YORK, et al.,
Plaintiffs,**

v.

**The CITY OF NEW YORK,
et al., Defendants.**

**No. 99 Civ. 9568(LAK).**

United States District Court,
S.D. New York.

Aug. 6, 2002.

See, also, 2002 WL 511548.

Alani Golanski, Richard A. Levy, Diane Paolicelli, Pamela Jeffrey, Tarik F. Ajami, Levy, Phillips & Konigsberg, LLP, New York City, Robert Spergel, Law Offices of Robert Spergel, Oceanside, NY, for Plaintiffs.

Julie O'Neill, Stuart I. Parker, Amy F. Melican, Assistant Corporation Counsel, Michael D. Hess, Corporation Counsel of the City of New York, New York City, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiffs are Latino and African–American members of the New York City Police Department ("NYPD") and the Latino Officers Association ( "LOA"), a fraternal organization whose members are Latino and African–American current and former NYPD officers and civilians. They allege discrimination by the NYPD in violation of Title VII of the Civil Rights Act of 1964, as amended,[1] 42 U.S.C. §§ 1981, 1983, 1985, the First and Fourteenth Amendments, the New York State Human Rights Law ("NYSHRL"),[2] the New York City Human Rights Law ("NYCHRL"),[3] and New York common law. They seek an injunction requiring the NYPD to abolish discrimination, ensure equal treatment, cease retaliation, remove the disciplinary charge process from the NYPD to the external New York City Office of Administrative Trials and Hearings ("OATH"), process administrative charges outside the NYPD, reinstate class members who were terminated in violation of the law, expunge the disciplinary records of class members disciplined under the discriminatory policy,

---

1. 42 U.S.C. §§ 2000e, et seq.

2. N.Y. Exec. L. § 296.

3. N.Y.C. Ad. C. § 8–207.

and cooperate with a court-appointed independent monitor who would oversee the changes. They pray also for back pay, benefits and seniority, compensatory and punitive damages, and attorneys' fees.

Plaintiffs now move to certify a class of all Latino and African–American individuals who have been, are, or will be employed by the NYPD as uniformed officers, including civilians who perform the same employment functions as uniformed officers, who have been or will be subjected to discrimination on the basis of race, color or national origin in the form of a hostile work environment, disparate disciplinary treatment, and retaliation for the exercise of their rights. For the reasons discussed more fully below, plaintiffs' motion to certify a class is granted in part. The Court bifurcates plaintiffs' claims and certifies the liability stage of the claims, as discussed below, for class treatment under Rule 23(b)(2).

### Facts

Uniformed employees of the NYPD are those the casual observer would consider police officers. All other NYPD employees are considered "civilian[s]," although some civilians perform the same duties as uniformed employees.[4] There are four ranks of non-civilian uniformed employees appointed and advanced through the civil service system: police officers, sergeants, lieutenants, and captains.[5] The NYPD employs approximately 32,547 police officers, 5,177 sergeants, 1,668 lieutenants, and 718 captains.[6] Sixty-eight percent of officers are white, seventeen percent are Latino, and thirteen percent are African–American.[7] Each uniformed employee is assigned to one of 540 different commands which are housed at 250 different locations throughout the city.[8] Approximately half of the uniformed employees work in the ninety seven precincts, police service areas, or transit districts.[9]

### A. The NYPD Disciplinary System

The lowest level of discipline of an officer involves a write-up in the minor violation log. Violations that are disposed of in this manner include offenses such as failure to have one's shoes shined. These violations are not reported up the NYPD hierarchy.

The next tier is known as command discipline ("CD"). CDs are used to respond to minor infractions of NYPD rules and regulations. A CD is initiated within a precinct or command by a supervisory officer's written report.[10] These reports then are investigated by the commanding or executive officer (typically a captain or higher) or the commanding officer's executive officer (typically a captain). Following the investigation, a CD is adjudicated by the commanding officer, that is to say the commanding officer decides whether formally to issue a CD and what penalty to impose. The commanding officer has considerable discretion on both of these fronts, discretion which is cabined somewhat by the severity of the offense. In the case of a "Schedule A" infraction, potential penalties include, *inter alia,* up to five days' suspension, reduced vacation time, a transfer or change in assignment, and limitations on overtime assignments. In the more serious "Schedule B" infractions, the commanding officer must take some disciplinary action, but has the discretion to impose a CD or to recommend upgrading the treatment of

---

4. The facts recited herein are as alleged by the plaintiffs and should not be construed as findings of fact. *See, e.g., German v. Federal Home Loan Mortgage Corp.,* 885 F.Supp. 537, 547 (S.D.N.Y. 1995); *Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51, 54 (S.D.N.Y.1993).

5. For ease of reference, the term "officer[s]" will be used to refer to all four types of uniformed employees. When the Court wishes to refer to a specific subset of officers, it will refer to it by rank.

6. *See* Anderson Dec. ¶ 7. Each type of uniformed employee is represented by one of five unions:

the Patrolmen's Benevolent Association ("PBA"), Detectives' Endowment Association, Sergeants' Benevolent Association, Lieutenants' Benevolent Association, or the Captains' Endowment Association. *Id.* at ¶ 8.

7. Faust Aff. Exh. 2.

8. Anderson Dec. ¶ 12.

9. *Id.* at ¶ 13.

10. Any uniformed officer with the rank of sergeant or above has the authority to issue a CD to a lower-ranking uniformed officer.

the alleged offense by bringing a formal charge and specification ("C & S") against the officer.[11]

The formal aspects of the NYPD disciplinary system are run through the NYPD's Department Advocate's Office (the "DAO") and the Office of the Deputy Commissioner of Trials (the "DCT"), except in cases following the substantiation of a complaint by the Civilian Complaint Review Board (the "CCRB").[12] The DAO is responsible for consulting with the NYPD's internal investigative units, preparing and prosecuting C & S's against uniformed officers and civilian NYPD employees, and conducting pretrial plea negotiations.[13] A commanding officer who concludes that a C & S is warranted must consult the DAO, and the DAO makes the final decision whether to bring the formal charges.[14]

The DCT consists of trial commissioners who preside over NYPD disciplinary cases and plea negotiations and render written findings of fact and recommendations to the Police Commissioner.[15] Prior to trial, the officer may be offered a negotiated plea by the DAO. If an officer believes that a proposed plea is unfair, the officer may reject the plea or may accept the guilt determination and challenge the penalty. If the officer rejects the plea, the case will proceed to trial.[16] A trial in this context is a hearing conducted by an administrative judge from the DCT at which the officer may be represented by counsel of his or her choice and the NYPD is represented by an attorney from DAO.[17] Following the hearing, the administrative judge forwards his or her findings and recommendations to the Police Commissioner for final action. The officer may contest the Commissioner's determination within the state courts.[18]

## B. Plaintiffs' Allegations

Plaintiffs make three broad allegations:

### 1. Hostile Work Environment

First, plaintiffs allege that the NYPD maintains and permits a work environment that is hostile to Latino and African–American officers. The complaint is peppered with anecdotal accounts of derogatory statements, directed at Latino and African–American officers as well as Latino and African–American members of the general public, that the plaintiffs claim demonstrate this hostile environment. They contend that the hostile work environment is evident to new officers as soon as they enter the police academy, where putative class members observed graffiti reading "I want to get out of here fast so I can legally kill niggers."[19] Graffiti referring to "spics" and "niggers" allegedly can be found "throughout the NYPD,"[20] and Latino and African–American officers allegedly have been referred to by these terms as well as by "Willie," "Goya bean," and "Platanos."[21] In addition to slurs and graffiti, plaintiffs allege that the names of Latino and African–American officers "regularly" are written on "Wanted" posters in precincts.[22]

---

11. Schedule A infractions include failure to lock an unguarded NYPD vehicle and smoking when prohibited. Schedule B infractions include failure to safeguard a prisoner and the loss of NYPD property. Violations are classified in the Patrol Guide. See Def. Ex. E.

12. In such cases, hearings are held before OATH, pursuant to an agreement between the PBA and the NYPD. Def. Mem at n. 2; Lubin Dec. ¶ 12.

13. Lubin Dec. ¶ 10.

14. Id. at ¶ 26. The involvement of the DAO in the decision to bring formal charges stems from a 1995 change in the NYPD's disciplinary system.

15. Id. at ¶ 11.

16. NYPD officers who are in their initial probationary periods or who have been placed on dismissal probation as a result of a previous violation may be dismissed without a hearing. Id. at ¶ 15.

17. Id. at ¶ 18.

18. Id. at ¶¶ 19–20.

19. Miranda Aff. ¶ 16.

20. Golanski Aff. ¶ 14.

21. Id.

22. Second Amended Complaint ¶ 59 ("Cpt.").

## 2. Disparate Treatment

Second, plaintiffs allege that the NYPD's application of its disciplinary rules and processes embodies a pattern or practice of disparate treatment of Latino and African–American officers. They allege that Latino and African–American officers are subject to formal and informal disciplinary proceedings more frequently than white officers, are punished more severely than white officers for the same violations, and are disciplined for infractions for which white officers are not.

Plaintiffs offer statistics from three different sources. While the statistical evidence proffered by plaintiffs may be sufficient to satisfy the requirements of Rule 23(a), "proving that the grant of authority to supervisory employees either results in a pattern or practice of discrimination or affects one class of employees more harshly than others is likely to be extremely difficult." [23] Indeed, by relying on these statistics at the certification stage, the Court expresses no opinion on the admissibility or probative value of these studies. Indeed, even assuming they are admissible, it is not clear that they are sufficient to meet plaintiffs' burden of production in establishing a prima facie case. [24]

### a. The Precinct and Sergeant Studies

The first two studies reflect narrow inquiries, one that focused on one precinct, and one that compared the experience of one Latino sergeant with those of similarly situated white sergeants.

In 1992, plaintiff Miranda "undertook a study" of the disciplinary measures meted out in the 94th precinct. According to Miranda, African–American and Latino officers made up 26 percent of the precinct, but received 55 percent of the CDs and 81 percent of the C & S's. [25] Plaintiffs assert that the study revealed systemic discrimination in areas of discipline, roll call, evaluation, and the assignment of African–American and Latino supervisors. [26]

In 1998, at the request of a Latino sergeant who was suing the NYPD for discrimination, Pace University Professor Barry Skolnick analyzed assorted data related to evaluations and discipline of sergeants. [27] He concluded that "discrimination against minorities is widespread, permanent and well-settled within the disciplinary system of the New York City Police Department." [28]

### b. The Faust Study

The third and most comprehensive set of statistics offered by the plaintiffs comes from Richard Faust, a statistical analyst who evaluated data concerning NYPD C & S actions and found racial disparities in charging, venue, disposition and penalties. He based his findings on the Case Analysis & Tracking System database ("CATS"), a database that contains information on all C & S actions taken against officers since 1995. [29]

---

**23.** *Caridad v. Metro–North R.R.*, 191 F.3d 283, 291 (2d Cir.1999).

**24.** At this time, the Court declines defendants' invitation, *see* Def. Mem. at 49, to strike the first two studies. While they may not satisfy plaintiffs' burden at trial, they do tend to flesh out the picture of alleged disparate treatment throughout the NYPD and thus are useful in considering the class certification issue. *See, e.g., Robinson v. Metro–North R.R.*, 267 F.3d 147, 168 (2d Cir. 2001) ("To the extent that evidence regarding specific instances of alleged discrimination is relevant during the liability stage, it simply provides a texture to the statistics.") (internal quotation marks omitted). In any case, the Faust study, *infra*, combined with the hostile work environment allegations, would suffice at this stage of the case to establish a link between the disciplinary disparities and race. *See infra* text accompanying note 75.

**25.** Miranda Aff. ¶ 30, Golanski Aff. Exh. 5 ("Miranda Rep.").

**26.** Pl. Mem. at 3.

**27.** Professor Skolnick's study appears to be based on incomplete materials. *See* Golanski Aff. Exh. 6 at 2 ("Please refer to my letter [ ] requesting additional material which has not yet been made available at this time.") ("Skolnick Rep.").

**28.** Skolnick Rep. at 3.

**29.** There is a manual record of CDs but, as of the time of this motion, the data had not been entered into a database for analysis. Faust Aff. ¶¶ 8–9. The CATS uses the designations "Black," "Hispanic," and "White" to refer to officers. For the sake of consistency with plaintiffs' allegations, the Court will continue to use the terms Latino and African–American. It is

### 1. Initiation of Charges and Proceedings

Faust concluded that Latino and African–American officers were overrepresented in disciplinary proceedings by 5 and 7 percent, respectively.[30] In terms of the proportion of officers charged through the C & S system, Latino officers were overrepresented by 47 percent and African–American officers by 74 percent. Latino officers were overrepresented by 57 percent and African–American officers by 87 percent in the number of incidents charged.[31]

Faust performed the binomial test on these data to assess the statistical significance, if any, of the disparities.[32] He concluded that the disparities in this case "substantially" exceeded two standard deviations. The Z scores for the disparities Latinos and African–Americans were 4.26 and 6.39, respectively. According to Faust, there is less than a one percent chance that these data could have been generated randomly.[33]

### 2. Venue

There are two venues for the trial of a C & S: DCT and OATH. Because it is external to the NYPD, OATH is perceived to be the more officer-friendly venue.[34] Faust found a racial disparity in the percentage of officers whose charges are tried in front of the DCT as opposed to the OATH.[35] Seventy-six per-cent of white officers were tried in front of the DCT, but 86 percent and 81 percent of African–American and Latino officers, respectively, were tried there.[36]

### 3. Case Disposition

There are several case dispositions that are considered favorable to the officer. Faust found that the overall likelihood of a trial outcome favorable to the officer varied by race as well. Thirty percent of white officers received favorable dispositions compared to 20 and 23 percent of African–American and Latino officers, respectively.[37] The corresponding disparities exist for unfavorable dispositions (68 percent for white, 80 percent for African–American and 77 percent for Latino officers).[38] The most favorable possible outcome is the dismissal of charges before trial. White officers were 50 percent more likely than African–American and 31 percent more likely than Latino officers to have the charges against them dismissed.[39] Twenty one percent of the charges against white officers were dismissed, compared to 14 percent for African–American and 16 percent for Latino officers.[40] The most unfavorable disposition, the filing of charges, was also the most disparately received: 29 percent of African–American, 28 percent of Latino, and only 20 percent of white officers saw

assumed that the Black and Hispanic categories correspond to the African–American and Latino members of the proposed class. Data also are recorded for "Asian" and "(American) Indian" officers, but were not analyzed by Faust. *Id.* at ¶¶ 10–11.

**30.** *Id.* at ¶ 12.

**31.** *Id.* at ¶ 13. In terms of percentage of officers charged, 7.2 percent of white officers, 10.6 percent of Latino officers, and 12.5 percent of African–American officers were charged in the C & S system. Because some officers have more than one charge against them, and those officers who do more often are Latino or African–American than white, Latino and African–American officers are more overrepresented in the total incidents data.

**32.** The binomial test produces what is known as a Z score for each group. Z scores that exceed two standard deviations, or 1.96, are said to be statistically significant at the commonly accepted .05 level of significance. There is a five percent chance that a disparity with a Z score of 1.96 occurred randomly. *Id.* at 16.

**33.** *Id.* at ¶ 16.

**34.** *Id.* at ¶ 19.

**35.** Faust's affidavit asserts that the decision to hold the trial in front of the Deputy Commissioner for Trials or the OATH is made by the NYPD. *But see supra* note 12 (pursuant to an agreement between the PBA and the NYPD, trials of police officers that follow charges substantiated by the CCRB are conducted in the OATH).

**36.** Faust Aff. ¶ 20.

**37.** *Id.*

**38.** *Id.*

**39.** *Id.* at ¶ 23.

**40.** *Id.* at ¶ 22.

their case end with the filing of charges.[41] African–American officers were 45 percent more likely and Latino officers 40 percent more likely than white officers to have charges filed against them.[42] White officers were 50 percent more likely than either African–American or Latino officers to be found not guilty of the C & S against them.

### 4. Penalty

If an officer receives an unfavorable disposition, a penalty is assessed. One of the least severe penalties an officer can receive is to have the C & S reduced to a CD. White officers were 114 percent more likely than African–American and 50 percent more likely than Latino officers to receive this penalty.[43] Conversely, the most severe penalty an officer can receive is involuntary termination without benefits. African–American officers were 63 percent and Latino officers 38 percent more likely to receive this penalty than white officers. Some officers are offered a negotiated plea prior to the resolution of charges against them. White officers were 11 percent more likely than Latino and 9 percent more likely than African–American officers to be offered a negotiated plea.[44] If the first plea offer is rejected, white officers were 11 percent more likely than either African–American or Latino officers to be offered a renegotiated plea.[45]

### 5. Data Related to Specific Charges

In addition to the foregoing analysis, which considered all types of C & S charges, Faust performed separate analyses of the charges

of making a false statement and conduct prejudicial to the good name of the department.[46] Proportionately, African–American and Latino officers were 50 and 33 percent more likely, respectively, than white officers to be charged with making a false statement.[47] White officers were 100 percent more likely than African–American officers and 200 percent more likely than Latino officers to receive a favorable disposition of their false statement charges. White officers were 140 percent more likely than African–American and Latino officers to have false statement charges dismissed and were 180 percent more likely than Latino and 40 percent more likely than African–American officers to be found not guilty of such charges.[48]

Both African–American and Latino officers were 21 percent more likely to be charged with conduct prejudicial to the good name of the department than white officers.[49] Twenty-seven percent of white officers so charged receive favorable dispositions compared to 20 percent of African–American and Latino officers. A white officer was 120 percent more likely than a Latino officer and 175 percent more likely than a African–American officer to be found not guilty of this charge.[50]

### 3. Retaliation

Plaintiffs allege that Latino and African–American officers have been retaliated against for complaining about what they perceived to be a hostile work environment and race-based disparities in discipline.[51] The

---

41. *Id.* The filing of charges generally leads to an officer's resignation. *Id.*

42. *Id.* at ¶ 23.

43. *Id.* at ¶ 28.

44. *Id.* at ¶ 30.

45. *Id.* at ¶ 31.

46. Plaintiffs assert that these charges in particular are able to be used and manipulated in a discriminatory manner because they are so vague. Plaintiffs further allege that as part of the retaliatory investigation and interrogation of Latino and African–American officers, class members are more likely to be subjected to a type of internal NYPD interrogation known as a "GO–

15," and statements made by Latino and African–American officers during GO–15s are used as the basis for making false statements charges against them, *see, e.g.,* Cpt. ¶ 47–48, although white officers who make false statements during GO–15 interrogations are not subject to the same discipline. *See, e.g., id.* at ¶ 99.

47. Faust Aff. ¶ 17.

48. *Id.* at ¶ 24.

49. *Id.* at ¶ 18.

50. *Id.* at ¶ 25.

51. *See, e.g.,* Cpt. ¶ 50 ("The NYPD has improperly used its disciplinary system ... in furtherance of a pervasive and unrelenting pattern of retalia-

alleged retaliation included, *inter alia*, transfers to undesirable positions within the NYPD, denial of transfer requests, vacation days and other benefits, suspension, and physical attacks. Plaintiffs claim also that retaliation sometimes took the form of extended, intrusive investigation and interrogation of Latino and African–American officers who voiced complaints about discrimination, investigation and interrogation to which white officers who voiced similar complaints were not subject.[52] While some plaintiffs allegedly were subject to this retaliation, plaintiffs allege that all class members were chilled in the exercise of their First Amendment rights by the threat of retaliation.[53] Plaintiffs allege also that putative class members who sought new employment were slandered by the NYPD and that class members who did voice concerns regarding the disparate treatment suffered libel and slander at the hands of the NYPD although similarly situated white officers did not.

### C. Defendants' Contentions

Defendants rejoin that the NYPD continually is improving its disciplinary system to ensure "equity, efficiency, and effectiveness" and that these changes include increases and decreases in the discretion granted to commanding officers that are aimed at eliminated any existing disparate treatment.[54] This of course goes to the merits of plaintiffs' claims, a subject matter into which the Court does not delve at the certification stage of the case.[55]

### Discussion

To qualify for certification, a proposed class must meet the four requirements of Rule 23(a) as well as at least one of the requirements of Rule 23(b). Before turning to these requirements, the Court pauses to consider the phases of a disparate treatment case, as well as whether the LOA has standing.

### A. Phases of Pattern or Practice Disparate Treatment Cases

There are two phases to any pattern or practice case: the so-called liability and remedial phases. This is "something of a misnomer"[56] because, although the defendant's liability to the class as a whole is determined in the liability phase, the remedial phase implicates questions of liability as well, albeit liability to individual plaintiffs. At the liability stage of the case, plaintiffs bear the ultimate burden of proving by a preponderance of the evidence that the defendants engaged in a pattern or practice of discrimination against the class. If they succeed, "the [C]ourt may proceed to fashion class-wide injunctive relief."[57] Where plaintiffs have sought individual relief, such as back pay and compensatory and punitive damages, in addition to such class-wide injunctive relief, a remedial phase must follow the liability phase to determine whether any particular plaintiff is entitled to this individualized relief. At the remedial stage, class members enjoy "a presumption in their favor 'that any particular employment decision, during the period in which the discriminatory policy was in force, was made pursuant to that policy.'"[58] This presumption

> "substantially lessen[s] each class member's evidentiary burden relative to that which would be required if the employee were preceeding separately with an individual disparate treatment claim.... Rather than having to make out a prima facie case of discrimination and prove that

tion against class members."); Miranda Aff. ¶ 40 ("Latino and African–American officers who formally or informally complain of ... widespread discrimination ... are then singled out for retaliation and further discrimination.").

**52.** *See, e.g.*, Cpt. ¶ 13 (alleging discriminatory retaliation).

**53.** *See, e.g., id.* at ¶ 11 ("[F]ear of retaliation and reprisals has severely chilled the class members' willingness to bring individual claims against the defendants.").

**54.** *E.g.*, Def. Mem. at 9.

**55.** *See, e.g., Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

**56.** *Robinson,* 267 F.3d at 158 n. 4.

**57.** *Id.* at 159.

**58.** *Id.* (quoting *Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 362, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

the employer's asserted business justification is merely a pretext for discrimination, a class member at the remedial stage ... need only show that he or she suffered an adverse employment decision and therefore was a potential victim of the proved [class-wide] discrimination." [59]

As to any plaintiffs who are able to show an adverse employment action, the burden shifts to the employer to show that the action was undertaken for a lawful reason. If the employer does not meet this burden, the employee is entitled to individualized equitable relief.[60] Class members who seek compensatory damages will be required further to prove that the discrimination caused them "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, [or] other nonpecuniary losses." [61]

The Court refers to the concepts of liability and remedial phases fully aware that any remedial stage would involve liability determinations as well.

## B. Standing

■ The LOA is a fraternal organization whose members are current and former uniformed employees of the NYPD and current and former civilian employees who carry out the same functions as uniformed employees who are of Latin American or African–American descent. It purports to bring this suit not on its own behalf but on behalf of its members. To have standing to do so, it must meet the standards set forth in *Hunt v. Washington State Apple Advertising Commission*.[62] Specifically, the LOA has standing if:

"(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit." [63]

Members of the LOA plainly have standing to sue on their own behalf for the injuries alleged. According to the complaint, "[t]he mission of the LOA is to meet the special and general needs of its member with regard to all aspects of health, safety, working conditions, and other benefits due employees of the NYPD." [64] The complaint further alleges that the NYPD's "discriminatory and retaliatory policies, practices and customs have perceptibly impaired the LOA's ability" to engage in the activities for which it was established. Hence, the interests the LOA seeks to protect through the prosecution of this lawsuit, its members' interests in a discrimination-free workplace, are germane to its purpose. Finally, the liability stage of this case, as described above, does not require the involvement of the LOA's individual members. The LOA therefore satisfies *Hunt's* requirements and has standing to bring this suit. The Court expresses no view on whether the LOA would have standing during all or part of any remedial phase of the case.

Having found that the LOA is a proper party to this action, the Court now turns to the requirements of Rule 23.

## C. Rule 23(a)

Defendants first challenge the class as ill-defined. While "[t]he definition of the class is of primary importance," [65] defendants' conclusory statement that plaintiffs' class definition "assumes too much" [66] misses the theory of plaintiffs' case. For example, if true, the allegation that the NYPD is a hostile work environment for African–American and Latino officers indeed would mean that every Latino and African–American employed by the NYPD has suffered or will suffer from

---

**59.** *Id.* (internal quotation marks omitted, alterations in original).

**60.** Such individualized equitable relief may include back pay and front pay.

**61.** *Id.* at 160 (quoting 42 U.S.C. § 1981a(b)(3)).

**62.** 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

**63.** *Id.* at 343, 97 S.Ct. 2434.

**64.** Cpt. ¶ 18.

**65.** *Wright v. Giuliani,* No. 99 Civ. 10091(WHP), 2000 WL 777940, at *10 (S.D.N.Y. Jun.14, 2000).

**66.** Def. Mem. at 16.

discrimination. At the liability stage, a class that includes all Latinos and African–Americans is perfectly appropriate.

Defendants further take issue with plaintiffs' failure to limit the class to a particular period of time. They are correct to the extent that the claims are barred by the statute of limitations.[67] The claims therefore will be so limited.

The Court now considers whether the four requirements of Rule 23(a), numerosity, commonality, typicality, and adequacy of representation, are satisfied.

### 1. Numerosity

■ Rule 23(a)(1) requires that the class be so numerous that joinder of all its members is impracticable. There is no bright-line number at which joinder becomes impracticable.[68] Members of the putative class are estimated to number in the thousands.[69] Joinder of all the plaintiffs would be impracticable, a point which defendants do not contest. The numerosity requirement is satisfied.

### 2. Commonality

■ Rule 23(a)(2) requires that there be questions of law or fact common to the class. The commonality requirement is satisfied "if plaintiffs' grievances share a common question of law or of fact." [70]

Defendants contend that commonality is lacking because individual plaintiffs felt the brunt of the alleged discrimination in different ways. They argue, for example, that the fact that some plaintiffs contend that they were forced to transfer while others contend they were denied requested transfers precludes a finding that the class shares issues of fact or law in common.

Defendants' arguments are not persuasive. Resolution of plaintiffs' claims undeniably will involve common questions of fact or law. These include whether the NYPD's facially-neutral disciplinary system results in disparate treatment of African–American and Latino NYPD officers and whether African–American and Latino officers who voice concern about the hostile work environment and the disparate treatment they receive are retaliated against systemically. Furthermore, the fact that defendants' allegedly discriminatory practices manifest in myriad ways cannot save the defendants from answering to the class of persons injured by those practices.[71] The proposed class representatives allege that they have suffered from the hostile work environment at the NYPD, that they have been disparately treated under the NYPD's disciplinary system, and that they have been retaliated against for exercising their rights. That one plaintiff may have been transferred to an undesirable position while another perhaps was denied a transfer is of little moment. Both allegedly were injured by discriminatory acts of the NYPD. The legal theories under which the class representatives seek recovery are common throughout the class.[72]

The delegation of discretionary authority to supervisors for disciplinary purposes constitutes a policy or practice sufficient to satisfy the commonality requirement.[73] "Of

---

**67.** The longest statute of limitations governing the discrimination claim is the three year statute applicable to the NYSHRL claim.

**68.** Indeed, classes as small as 35 have met this requirement. *See In re Auction Houses Antitrust Litig.,* 193 F.R.D. 162, 164 & n. 2 (S.D.N.Y.2000) (citing examples).

**69.** Plaintiffs estimate the putative class size to be approximately 6000 Latino and 5000 African–American officers. *See* Cpt. ¶ 10.

**70.** *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997).

**71.** This is true even under the more stringent "predominance" requirement of Rule 23(b)(3).

*See In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 139 (2d Cir.2001) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.").

**72.** Not only are the legal questions posed by the plaintiffs at the liability stage appropriate for classwide treatment, defendants' defenses at the liability stage will apply classwide as well.

**73.** *Caridad,* 191 F.3d at 292–93. *See also id.* at 292 ("[T]he fact that the class Plaintiffs challenge the subjective components of company-wide employment practices does not bar a finding of commonality under either the disparate treatment or disparate impact model.").

course, class certification would not be warranted absent some showing that the challenged practice is causally related to a pattern of disparate treatment or has a disparate impact." [74] The statistics submitted by the plaintiffs, regardless of their ultimate persuasiveness, are sufficient to demonstrate common questions of fact because it tends to establish that being Latino or African–American has an effect on an officer's involvement and treatment in the NYPD's disciplinary system. [75]

Similarly, plaintiffs' claim of a race-based hostile work environment also satisfies the commonality requirement.

### 3. Typicality

■ Rule 23(a)(3) requires that the claims of the class representatives be typical of the claims of the class. The typicality requirement refers to:

"the nature of the claim of the class representatives, and not to the specific facts from which the claim arose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." [76]

This criterion "does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact 'occupy essentially the same degree of centrality to the named plaintiff's claims as to that of other members of the proposed class." ' [77] It is satisfied when " 'each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.' " [78] This helps ensure that the due process rights of the absent class members will be protected.

The commonality and typicality requirements address many of the same concerns. "Both serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." [79] So it should come as no surprise that defendants argue that typicality also is lacking because different plaintiffs felt different effects of the discrimination. For the reasons stated above, the Court is not convinced.

Defendants suggest also that these plaintiffs, who as LOA members represent a small minority of Latino and African–American officers, [80] are not typical of the department's Latino and African–American members. As alleged, however, the claims of these plaintiffs are of racial discrimination. They seek relief under legal theories applicable to the class as a whole. Additionally, to the extent that LOA membership did play a role in the discrimination directed at particular plaintiffs, plaintiffs have alleged that that discrimination was based on race. [81] Should it turn out at some later stage of this litigation that the alleged discrimination against the class representatives was based on something other than race, such as LOA membership, the Court will revisit this typicality determination.

The "primary criterion [for determining typicality] is the forthrightness and vigor with which the representative party can be

---

74. *Id.* at 292.

75. *See id.* at 293.

76. *Dura–Bilt Corp. v. Chase Manhattan Bank,* 89 F.R.D. 87, 99 (S.D.N.Y.1981).

77. *Caridad,* 191 F.3d at 293 (quoting *Krueger v. New York Tel. Co.,* 163 F.R.D. 433, 442 (S.D.N.Y. 1995)).

78. *Robinson,* 267 F.3d at 155 (quoting *Marisol A.,* 126 F.3d at 376).

79. *General Tel. Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

80. Only 2,000 of the NYPD's 11,000 Latino and African–American officers belong to LOA. Miranda Aff. ¶¶ 3–4.

81. *See, e.g.,* Cpt. ¶ 153 (alleging the posting of derogatory statements such as "LOA = PERPS" and "Latino Officers Association = Latin Kings"); *id.* at ¶ 161 (alleging that postings by African–American fraternal organization were defaced although similar postings by white fraternal organization were not).

expected to assert the interests of the members of the class." [82]   In view of the fact that the named plaintiffs' claims are based on the same legal theories and factual allegations as those of the putative class members, the typicality requirement is satisfied.[83]

### 4. Adequacy of Representation

■  The final prerequisite to a class certification is that the representative party will fairly and adequately protect the interests of the class.   This requires that the named or lead plaintiffs have "a sufficient stake in the outcome to ensure zealous advocacy, that the class representative does not have antagonistic or conflicting claims with other class members, and that counsel for the named plaintiff is experienced, qualified, and generally able to conduct the litigation." [84]   The Court does not doubt the adequacy of plaintiffs' counsel, or their ability zealously to prosecute this case.[85]   Defendants nonetheless challenge the adequacy of the class representatives on several grounds, none of which suffices to defeat certification.

First, defendants argue that putative representatives who are not uniformed employees cannot represent those who are.   As the putative class is composed of uniformed employees as well as nonuniformed employees who perform the duties of uniformed employees, however, this argument is without merit.

Second, defendants question the ability of those class representatives who hold a supervisory rank to represent the interests of non-supervisory class members.   Defendants' point here is not entirely without substance.   To the extent that a potential remedy might include removal of discretion from these commanding-officer class members, a conflict conceivably might arise between police officers and commanding officers who enjoy the discretion.   But not all conflicts are fatal to certification, only those that are fundamental and actual rather than hypothetical or speculative.[86]   The Court does not see more than a hypothetical conflict.   Commanding-officer class members allegedly are subject to the disparate impact of the disciplinary system themselves.   There is no reason to for the Court to think that the commanding officer class members have any less of a desire to end any discrimination within the NYPD than the police officer members.   Their interests on this point are aligned.   If an actual conflict develops, the Court is prepared to revisit this question and consider certifying a separate subclass for each rank of uniformed officer.[87]

Next, defendants question the ability of plaintiffs who are members of the LOA ade-

82.  *Nat'l Auto Brokers Corp. v. General Motors Corp.*, 60 F.R.D. 476, 486–87 (S.D.N.Y.1973).

83.  *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992), *cert. dismissed sub nom. Hart Holding Co., Inc. v. Drexel Burnham Lambert Group, Inc.*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993).

84.  *Block v. Abbott Labs.*, 2002 WL 485364, *6 (N.D.Ill. Mar. 29, 2002).

85.  *See* Cpt. ¶¶ 91–95 (detailing counsels' credentials).

86.  *See Visa Check/MasterMoney*, 280 F.3d at 145.

87.  The Court has the discretion to establish subclasses. *See Lundquist v. Security Pacific Automotive Financial Services Corp.*, 993 F.2d 11 (2d Cir.1993).

At this stage, the Court finds no need to certify subclasses to differentiate between present and future claimants.  At the liability stage, the same legal theories are available to both present and future claimants.  Should the plaintiffs succeed in establishing liability, any equitable relief to which the class would be entitled would be of the sort that would affect present and future claimants in the same way.  And that most likely would be all that future claimants would find themselves entitled to.  When and if this case proceeds to a remedial stage, damages determinations will have to be made on a more' or less individual basis.  It is unlikely that the future claimant members of the class would have reason or ability to seek damages in that stage.  Because the interests of present and future class members are aligned at this stage, the Court declines to certify two subclasses.

A subset of defendants' intraclass conflict argument is that, in the event make-whole relief is granted, some class members may find themselves potentially displaced by other class members who are promoted as part of the remedy sought by plaintiffs.  If such a possibility precluded class certification, classes of employees seeking make-whole relief never would be certified.  In any event, this potential for conflict is irrelevant at the liability stage, and can be dealt with in the individual damage determinations should the need arise.

quately to represent those who are not. As noted above, all of the wrongs alleged by plaintiffs, whether they take the form of First Amendment violations, retaliation, disparate treatment or a hostile work environment, are race-based. Absent any reason to find that something other than race is at the root of defendants' alleged discrimination, there is no reason to think that plaintiffs who are members of LOA cannot or will not adequately represent the interests of all class members.

Defendants make the same argument with respect to the inadequacy of plaintiffs who claim retaliation. Once again, defendants miss the crux of plaintiffs' complaint: it is not simply that defendants retaliated against putative class members, it is that they did so in a discriminatory manner, that is to say, they did not so retaliate against white officers. Plaintiffs allege also that this discriminatory retaliation has had a chilling effect on the class as a whole. Given the presence as class representatives of officers who claim they were retaliated against and those who were chilled and therefore did not lodge complaints, the interests of all class members are adequately represented.

■ Defendants next contend that plaintiffs Cartagena, Miranda, and Monserrate are inadquate class representatives because they have commenced or settled other litigation against the NYPD.[88] Plaintiffs Miranda and Monserrate allege retaliation that occurred after the termination of their prior

lawsuits against the NYPD.[89] The fact that they previously were involved in lawsuits against the NYPD does not make them inadequate class representatives, although their claims may be subject to individual defenses.

■ Plaintiff Cartagena is in a different situation. Both of her lawsuits against the NYPD were filed after the filing of the second amended complaint in the instant action. More important, this Court, by order of Judge Chin dated November 9, 2001, ordered her to discontinue her claims in this case.[90] In consequence, she is not an adequate class representative.

■ Finally, defendants contend that the plaintiffs who fail to allege that they filed timely EEOC complaints are inadequate representatives.[91] Defendants are correct that an individual plaintiff who failed to timely file an EEOC complaint may not later file suit under Title VII. Once a class has been certified, however, there is no requirement that every class member have filed an EEOC charge.[92] Plaintiffs do allege that at least three EEOC complaints were timely filed by the LOA on behalf of classes that included the proposed class representatives. Furthermore, at least seven individual plaintiffs timely filed complaints. The defendants thus were on notice of the claims contained in the present complaint.[93] In consequence, failure to have filed their own EEOC charges does not impair the named plaintiffs' abilities to represent the class.[94] Furthermore, the fil-

**88.** *See* Def. Mem. at 48. Defendants contend also that African–American plaintiffs, who purportedly are represented in a different lawsuit, *Guardians Ass'n v. City of New York,* 99 Civ. 4960(MGC), by another fraternal organization, are improper class representatives, and indeed, improper class members. This Court already has determined that the cases are sufficiently different. *See* Pretrial Order, 99 Civ. 9568(LAK) (S.D.N.Y. July 26, 2000). Any *res judicata* concerns defendants have with respect to particular plaintiffs can be dealt with adequately at the remedial stage.

**89.** *See, e.g.,* Cpt. ¶ 174

**90.** *See* Pretrial Order, *Cartagena v. New York City Police Dep't.,* 99 Civ. 11987(DC) (S.D.N.Y. Nov. 9, 2001).

**91.** These plaintiffs are Alvarez, Ariza, Castrp, Figueroa, Miranda, Monserrate, and Vega.

**92.** *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (no requirement that unnamed class members file charges with EEOC so long as a class member has timely filed such charges).

**93.** *See Sharpe v. American Express Co.,* 689 F.Supp. 294, 297 (S.D.N.Y.1988) ("This filing deadline is akin to statutes of limitation in that its purpose is to prevent stale claims and give prompt notice to an employer of an impending action.").

**94.** *Lo Re v. Chase Manhattan Corp.,* 431 F.Supp. 189, 194 (1977) ("Having found that [some] plaintiffs properly initiated this suit, it is clear that it was not necessary for the remaining plaintiffs to have filed charges with the EEOC to join as [named] co-plaintiffs in a class action so long as 'they are in a class [with the EEOC charging parties] and assert the same or some of the

ing of EEOC charges is a prerequisite only to the bringing of a Title VII claim. It has no bearing on any of plaintiffs' other claims, all of which arise out of the same facts as the Title VII claim. Therefore, even if there were a requirement that all named class members have filed EEOC charges, the Court still would find the plaintiffs who did not file individual EEOC charges will zealously prosecute this case and act as adequate class representatives.

Because all of the class representatives, save Cartagena, "possess the same interest and suffer the same injury" as the remaining class members, the adequacy requirement is satisfied.[95]

### D. Rule 23(b)

Plaintiffs seek certification under Rule 23(b)(2) and (3).[96] Because certification under Rule 23(b)(2) is appropriate, it is unnecessary to consider certification under Rule 23(b)(3).[97]

Rule 23(b)(2) provides for class certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."[98] The Advisory Committee notes explain that "[a]ction or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on

grounds which have general applicability to the class."[99] Civil rights actions like the one at hand are "illustrative" of this type of class.[100]

Certification under Rule 23(b)(2) is appropriate "where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury."[101] Here, the actions complained of allegedly were taken on grounds generally applicable to the proposed class, even if not every member actually felt the brunt of the actions. To prevail at the liability stage of the case, plaintiffs will be required to prove that the defendants have engaged in a pattern or practice of intentional discrimination against class members. Should they do so, plaintiffs would be entitled to the injunctive and declaratory relief that they seek with respect to the class as a whole.

That defendants allegedly have acted on grounds applicable to the class as a whole does not end the matter. Class treatment under Rule 23(b)(2) is not appropriate if the class seeks mainly monetary relief. Because plaintiffs have sought compensatory and punitive damages in addition to equitable relief, the Court must determine which type of relief predominates.

This determination is governed by the Second Circuit's recent opinion in *Robinson v. Metro–North Railroad*.[102] Indeed, defendants concede that *Robinson* is "indistinguishable" from the instant case.[103] In *Rob-*

---

[same] issues.' '") (quoting *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir.1968) (first alteration in original)).

**95.** *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

**96.** In their supporting papers, plaintiffs reference Rule 23(b)(1), but to the extent that the complaint does not seek certification under this section, the Court declines to certify the class under that section.

**97.** *See Visa Check/MasterMoney*, 280 F.3d at 147.

**98.** FED. R. CIV. P. 23(b)(2).

**99.** Advisory Committee Note to 1966 Amendment, FED. R. CIV P. 23(b)(2).

**100.** *Id.*

**101.** *Robinson*, 267 F.3d at 162.

**102.** *Id.* at 147. As in this case, the putative class in *Robinson* was comprised of present and former employees of the defendant. The *Robinson* plaintiffs alleged that Metro–North's company-wide policy of granting department supervisors discretionary authority in the discipline and promotion of workers, authority plaintiffs allege was exercised in a racially discriminatory manner, had a disparate impact on African–American employees. They sought class-wide injunctive and equitable relief, including back and front pay as well as "compensatory damages for individual member of the class who were allegedly the victims of individual acts of intentional discrimination." *Id.* at 155.

**103.** Def. Mem. at 3.

*inson,* the court had to decide "whether [a] bright-line bar to (b)(2) class treatment of *all* claims for compensatory damages and other non-incidental damages (*e.g.,* punitive damages) is appropriate."[104] The court decided that such a bar was not appropriate.

> "Rather, we hold that when presented with a motion for (b)(2) class certification of a claim seeking both injunctive relief and non-incidental monetary damages, a district court must ... assess whether (b)(2) certification is appropriate in light of 'the relative importance of the remedies sought, given all of the facts and circumstances of the case.' "[105]

This Court's role is to consider all of the circumstances and determine the relative importance of the remedies plaintiffs seek. The Court finds that the positive value to the plaintiffs of the injunctive and declaratory relief sought is predominant. It is likely that plaintiffs would have brought this suit even in the absence of the potential for monetary recovery by some plaintiffs. The class seeks a declaration that the acts and practices of the NYPD are illegal. Plaintiffs seek also injunctive relief in the nature of, *inter alia,* an independent monitor, training, a revamping of the NYPD disciplinary system, and back pay. The injunctive relief sought here is quite significant. While plaintiffs do ask for monetary damages, the qualitative value of the declaratory and injunctive relief they seek overwhelms these requests for damages. It would be an extremely inefficient use of judicial resources to try the liability phase of each plaintiffs' claims individually. If defendants are liable, as plaintiffs allege, it is in everyone's interest to have the Court enter the equitable relief that, if complied with, would prospectively remedy any wrong.

Furthermore, the Court finds that class treatment of the liability stage of this case would be efficient and manageable. As discussed above with regard to the commonality and typicality requirements, whether any class member would prevail at the liability stage will depend on the answers to the same questions that would determine whether any other class member would prevail. "[L]itigating the pattern-or-practice liability phase for the class as a whole would both reduce the range of issues in dispute and promote judicial economy."[106]

Finally, the Court finds that the due process interests of the absent class members are protected. The putative class is not an *ad hoc* group of people with no common ties. Even apart from the existence of this lawsuit, the putative class is a cohesive and unified group. The named plaintiffs will adequately safeguard the interests of the absent class members at the liability stage of the case. To be sure, where compensatory damages are involved class homogeneity may falter and adequate representation alone may not suffice to safeguard absent class members' interests.[107] Should class cohesion falter at the remedial stage of this case, it would be appropriate for the Court to afford notice and opt-out rights to absent class members. But at this stage of the case, the Court finds that absent class members' interests are protected.

### Conclusion

Plaintiffs satisfy the four requirements of Rule 23(a), with the exception that the Court finds plaintiff Cartegena to be an inadequate class representative. The injunctive relief requested by plaintiffs predominates over the monetary relief, so class treatment of this case is proper under Rule 23(b)(2). In consequence, pursuant to Rule 23(c)(4)(A),[108] the Court severs the liability stage, as discussed above, from the individual remedial stage.

The questions of defendants' liability to the class on plaintiffs' hostile work environment, disparate disciplinary treatment, unlawful retaliation, 42 U.S.C. §§ 1981, 1983, 1985(3), discrimination in violation of NYSHRL, retaliatory actions in violation of

---

**104.** *Robinson,* 267 F.3d at 164 (emphasis in original).

**105.** *Id.* (quoting *Hoffman v. Honda of Am. Mfg., Inc.,* 191 F.R.D. 530, 535–36 (S.D.Ohio 1999)).

**106.** *Id.* at 168.

**107.** *Id.* at 165.

**108.** FED. R. CIV PRO. 23(c)(4)(A) ("an action may be brought or maintained as a class action with respect to particular issues...").

**94**

NYSHRL, discrimination in violation of NYCHRL, and retaliation for the exercise of First Amendment rights, for the time period beginning September 9, 1996 up to and including September 9, 1999, the date of commencement of the action, are certified for class treatment pursuant Rule 23(b)(2). Plaintiffs LOA, Reuben Malave, Thaddeus Gamory, Charles Castro, Adam Alvarez, Louis Vega, Michael Padilla, Hector Ariza, Manuel Gomez, Christopher Castro, Wilfred Maldonado, Clifford Muniz, Manuel Nunez, Carlos Jimenez, Jose Mercedes, Daniel Figueroa, III, Hilda Susu, Anthony Miranda, Manuel Delgado, Parnell Peterson, Fernando Sanchez, and Miram Monserrate are designated class representatives.

SO ORDERED.