UNITED STATES of America, Plaintiff,

and

The Vulcan Society, Inc., Marcus Haywood, Candido Nuñez, Roger Gregg, Plaintiff–Intervenors,

v.

The CITY OF NEW YORK, Fire Department of the City of New York, New York City Department of Citywide Administrative Services, and Mayor Michael Bloomberg and New York City Fire Commissioner Nicholas Scoppetta, in their individual and official capacities, Defendants.

No. 07–cv–2067 (NGG)(RLM).

United States District Court, E.D. New York.

May 11, 2009.

Elliot M. Schachner, Kenneth A. Stahl, Michael J. Goldberger, David Michael Eskew, United States Attorneys Office, Brooklyn, NY, Sharon Seeley, Washington, DC, Carolyn P. Weiss, Elizabeth A. Speck, U.S. Department of Justice, Washington, DC, Varda Hussain, United States Department of Justice, Washington, DC, for Plaintiff.

Georgia Mary Pestana, Office of the Corporation Counsel, New York, NY, William

S.J. Fraenkel, Corporation Counsel of the City of NY, New York, NY, Edward Lee Sample, II, New York City Law Department, New York, NY, Kami Zumbach Barker, Office of Michael A. Cardozo, New York, NY, Vivien V. Ranada, The City of New York Law Department, New York, NY, for Defendants.

## MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, District Judge.

In this case, Plaintiff United States of America (the "Federal Government") as well as the Vulcan Society, Inc. (the "Vulcan Society" or the "Vulcans"), Marcus Haywood, Candido Nuñez and Roger Gregg (the "Individual Plaintiffs") have brought suit to challenge the use by the City of New York of two written examinations in the screening and selection of applicants for entry-level firefighter positions in the Fire Department of New York ("FDNY").[1] The court has bifurcated the liability and relief phases of the case (*see* Docket Entry # 47), permitted intervention by Intervenors (*see id.*), denied the Intervenors' motion to amend their Intervenors' Complaint (*see* Docket Entry # 182), and denied Defendants' motion to dismiss the Intervenors' Complaint on timeliness grounds (*see* Docket Entry # 231). Familiarity with those decisions, and the history of the case, is assumed.

The Intervenors have moved for class certification. (*See* Docket Entry # 120.) The court grants the Motion in part, and certifies the class set forth below.

## I.  FACTUAL BACKGROUND

In its Complaint, the Federal Government brings claims under Sections 706 and 707 of Title VII, 42 U.S.C. §§ 2000e–5 & 2000e–6, alleging that the City's "use of two written examinations on a pass/fail basis, as well as its rank-order processing of applicants, in the screening and selection of applicants for appointment to the rank of entry-level firefighter, has resulted in disparate impact upon black and Hispanic applicants...." (Compl. (Docket Entry # 1) ¶¶ 1, 29–31, 34–37.)[2] In particular, the Federal Government is challenging the following employment practices:

(1) the use of Written Examination 7029 as a pass/fail screening device that has resulted in disparate impact upon black and Hispanic applicants;

(2) the use of Written Examination 7029 as part of the rank-order processing and selection of candidates for entry-level firefighter that has resulted in disparate impact upon black and Hispanic applicants;

(3) the use of Written Examination 2043 as a pass/fail screening device that has resulted in disparate impact upon black and Hispanic applicants;

(4) the use of Written Examination 2043 as part of the rank-order processing and selection of candidates for entry-level firefighter that has resulted in disparate impact upon black and Hispanic applicants.

(*See* Plaintiff United States' Response to Plaintiff–Intervenors' Motion for Certification of a Class (Docket Entry # 171) ("USA Cert. Br.") 3; *see also* Compl. ¶¶ 24–27, 29, 38.) The use of an examination as a "pass/fail screening device" means the use the examination to exclude from appointment those applicants that have failed the examination.

---

1. The court will refer to the Vulcan Society and the Individual Plaintiffs collectively as the "Intervenors." The court will refer to the various Defendants collectively as "Defendants" or the "City" for the purposes of this Memorandum & Order.

2. Section 706 allows the U.S. Attorney General to bring a civil action against a government entity upon referral from the Equal Employment Opportunity Commission ("EEOC") after the filing of a charge of discrimination. *See* 42 U.S.C. § 2000e–5(f)(1). Section 707 allows the Attorney General to bring a civil action "[w]henever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described[.]" 42 U.S.C. § 2000e–6(a). The United States challenges the same practices under both sections. (Plaintiff United States' Response to Defendants' Partial Motion to Dismiss (Docket Entry # 161) 7.)

The use of an examination as a part of "rank-order processing" means the use of the examination as a component of the overall score that determines an applicant's position on a hierarchical hiring list.

The Intervenors have filed their own Intervenors' Complaint. (*See* Docket Entry # 48.) The Intervenors' Complaint challenges the same practices challenged by the Federal Government, but the Complaint's scope is limited to discrimination against black applicants. Specifically, Intervenors challenge the City's use of:

(1) Written Examination 7029 "as a pass/fail screening device with a cutoff score of 84.705 [that] has resulted in disparate impact upon black applicants for appointment to the rank of entry-level firefighter[;]"

(2) Written Examination 7029 for "rank-order processing of applicants who passed [the examination]" resulting in "disparate impact upon black applicants for appointment to the rank of entry-level firefighter[;]"

(3) Written Examination 2043 "as a pass/fail screening device with a cutoff score of 70.000 [that] has resulted in disparate impact upon black applicants for appointment to the rank of entry-level firefighter[;]"

(4) Written Examination 2043 for "rank-order processing of applicants who passed [the examination]" resulting in "disparate impact upon black applicant upon black applicants for appointment to the rank of entry-level firefighter[;]"

(Intervenors' Compl. ¶¶ 52–55.) In addition to these "disparate impact" claims, Intervenors have added a "disparate treatment" claim, alleging that (5) "Defendants have long been aware of the discriminatory impact on blacks of their examination process," and that their "continued reliance on and perpetuation of these racially discriminatory hiring processes constitute intentional race discrimination...." (*Id.* ¶ 5 1; *see also id.* ¶ 56.)[3]

Intervenors are the Vulcan Society, Marcus Haywood, Candido Nuñez and Roger Gregg. According to a former President of the Vulcan Society, Captain Paul Washington, the New York City chapter of the Vulcan Society is "a fraternal, social and charitable organization of roughly 250 black New York City firefighters. A primary mission of the Vulcans is to organize ongoing projects to benefit our members, their families and our communities." (Affidavit of Paul Washington dated April 20, 2008 (Docket Entry # 125) ("Washington Aff.") ¶ 3.). Captain Washington's Affidavit sets out various ways in which the Vulcan Society is involved in the local community, by, for example, "talk[ing] about firefighting at public school career days," and "visit[ing] local churches to talk to the community about our organization and their neighborhood firehouses." (*Id.*)

In addition to other activities, "the Vulcan Society ... organizes recruitment, tutoring and training sessions for potential firefighter candidates. The Vulcans tutored roughly 300 people in preparation for Written Examination 2043[.]" (*Id.*) The Vulcans also "collaborate with the City to provide training for the physical performance test ("PPT")," a component of the application process for the position of entry-level firefighter. (*Id.*) According to Captain Washington, the Vulcan Society has "dedicate[d] a major portion of our time and resources to combating the FDNY's use of entry-level examinations, subject selection procedures, and appointment requirements that we believe discriminate against black applicants for firefighter and discourage many more from applying for the position in the first place." (*Id.* ¶ 4.) Captain Washington's Affidavit details the Vulcan Society's "ongoing efforts over many years to pressure the City and its leadership to address the discriminatory nature of the firefighter testing and appointment process." (*Id.* ¶ 18.) These efforts have included meetings and discussions with high-level City officials (*id.* ¶¶ 19, 20, 22, 26–28), and efforts "to

---

**3.** The Intervenors have added as Defendants the FDNY, the New York Department of Citywide Administrative Services ("DCAS"), Mayor Michael Bloomberg, and Fire Commissioner Nicholas Scoppetta. (Intervenors' Compl. ¶¶ 26–29.)

They also claim that the challenged practices violate 42 U.S.C. § 1981, 42 U.S.C. § 1983, New York Executive Law §§ 290 and 296, and New York City Administrative Code §§ 8–101.

educate ... elected officials and community spokespersons about the discrimination occurring at the FDNY, and to offer specific proposals and solutions" (*id.* ¶ 24, 25).

The Individual Plaintiffs are black applicants who sat for Written Examination 2043, passed the examination, and were placed on the eligibility list for the position of entry-level firefighter. (*See* Intervenors' Compl. ¶¶ 21–23; *see also* Affidavit of Marcus Haywood dated June 25, 2008 (Docket Entry # 176) ¶¶ 10–11; Affidavit of Roger Gregg dated May 8, 2008 (Docket Entry # 122) ¶¶ 9–10.)

In their Motion for Class Certification, the Intervenors ask the court to certify a class consisting of:

All black firefighters of firefighter applicants who were harmed by one or more of the following employment practices:

(1) Defendants' use of [Written] Exam 7029 as a pass/fail screening device with a cutoff score of 84.705;

(2) Defendants' rank-order processing of applicants who passed [Written] Exam 7029;

(3) Defendants' use of [Written] Exam 2043 as a pass/fail screening device with a cutoff score of 70.000;

(4) Defendants' rank-order processing of applicants who passed [Written] Exam 2043; and

(5) All future applicants who may be discriminated against in hiring if Defendants are not enjoined from using selection devices and procedures that violate Title VII and State and Local Human Rights law.

(Letter from Richard A. Levy dated March 16, 2009 (Docket Entry # 270) ("Cert. Letter") 2.) This proposed class includes "those black candidates who were not hired because of the challenged practices as well as those whose hiring was delayed as a result of the challenged practices." (*Id.* at 2 n. 1.)[4] The Intervenors seek class certification for both

the disparate impact and disparate treatment claims.

## II. LEGAL BACKGROUND

### A. Rule 23

■ "In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201–02 (2d Cir.2008). "If those criteria are met, the district court must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b)." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir.2008). Rule 23(b)(1) applies when class treatment is needed "to avoid adjudications mandating inconsistent standards of conduct[.]" *Cordes & Co. Financial Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 95 (2d Cir.2007) (*citing* Rule 23(b)(1)). Rule 23(b)(2) allows a class action to be maintained if " 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.' " *Parker v. Time Warner Entertainment Co., L.P.*, 331 F.3d 13, 18 (2d Cir.2003) (*quoting* Rule 23(b)(2)). Finally, Rule 23(b)(3) requires that " 'the questions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members[,]' " and " 'that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.' " *Cordes & Co. Financial Servs.*, 502 F.3d at 95 (*quoting* Rule 23(b)(3)).

Intervenors seek certification primarily under Rule 23(b)(2), but alternatively, under Rule 23(b)(3).

---

4. The Intervenors previously sought certification of the following class: "all black New York City firefighters or applicants for entry-level firefighter positions who have been discriminated against by Defendants' screening and selection devices and procedures used as part of open competitive examinations 7029, 2043, 6019, as well as those black applicants who will be discriminated against if such devices and procedures are not modified by Order of this Court." (Notice of Motion for the Certification of a Class (Docket Entry # 120).)

### B. Pattern–or–Practice and Disparate Impact

■ "[A] class action under Rule 23(b)(2) has been described as 'a uniquely appropriate procedure in civil-rights cases, which generally involve an allegation of discrimination against a group as well as the violation of rights of particular individuals.'" *United States v. New York City Bd. of Educ.*, 487 F.Supp.2d 220, 236 (E.D.N.Y.2007) (*quoting* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1776 (3d ed.2005)). Such is the case here. In *Robinson v. Metro–North Commuter Railroad Company*, 267 F.3d 147 (2d Cir.2001), the Second Circuit set out procedures for Rule 23(b)(2) certification of claims of discrimination against a group under the pattern-or-practice and disparate impact theories. The court will consider the Intervenors' Motion under the procedures set out in *Robinson*, and, thus, a review of those procedures is instructive.

#### 1. *Pattern–or–Practice Claims*

■ As described in *Robinson*, pattern-or-practice disparate treatment suits are generally "divided into two phases: liability and remedial." *Id.* at 158. In class action cases, this division allows the court to proceed on the liability phase for the class as a whole, and thereby "reduc[e] the range of issues in dispute and promot[e] judicial economy." *Id.* at 168. When pattern-or-practice cases are bifurcated, "the liability phase is largely preoccupied with class-wide statistical evidence directed at establishing an overall pattern or practice of intentional discrimination." *Id.*[5] If the plaintiffs make a *prima facie* showing, the burden shifts to the defendant whose "basic avenues of attack" for challenging the plaintiffs' statistical evidence consist of "assault[s] on the source, accuracy, or probative force" of that evidence. *Id.* at

159. If defendant meets its burden of production,[6] the trier of fact must then consider "the evidence introduced by both sides to determine whether the plaintiffs have established by a preponderance of the evidence that the defendant engaged in a pattern or practice of intentional discrimination." *Id.* Once this liability phase has concluded, "the court may proceed to fashion class-wide injunctive relief," should the plaintiffs succeed. *Id.* "If individual relief such as back pay, front pay, or compensatory recovery is sought, in addition to class-wide injunctive relief, the court must conduct the 'remedial' phase." *Id.*

■ Class members enter the remedial phase with a "presumption in their favor 'that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy.'" *Id.* (*quoting Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 362, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). "Rather than having to make out a prima facie case of discrimination and prove that the employer's asserted business justification is merely a pretext for discrimination, a class member at the remedial stage of a pattern-or-practice claim need only show that he or she suffered an adverse employment decision 'and therefore was a potential victim of the proved [class-wide] discrimination.'" *Id.* (internal citations and alterations omitted). "The burden of persuasion then shifts to 'the employer to demonstrate that the individual was subjected to the adverse employment decision for lawful reasons.'" *Id.* at 159–60 (internal citations omitted). Furthermore,

[i]f the employer is unable to establish a lawful reason for an adverse employment action, the employee is entitled to individualized equitable relief, which may include back pay and front pay. Class members

---

**5.** Statistical evidence on its own can make out a plaintiff's prima facie case. *Id.* at 158–59.

**6.** In particular, the defendant can:
present its own statistical summary treatment of the protected class and try to convince the fact finder that these numbers present a more accurate, complete, or relevant picture than the plaintiff[s]' statistical showing. Or the defendant can present anecdotal and other non-

statistical evidence tending to rebut the inference of discrimination. The prudent defendant will follow all three routes if possible, presenting its own version of the numbers game, attempting to undermine the plaintiff[s]' version with specific attacks on [the] validity of the plaintiff[s]' statistics, and garnering non-statistical evidentiary support as well.
*Id.*

who seek compensatory damages in addition to individualized equitable relief must then prove that the discrimination caused them "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, or other nonpecuniary losses."

*Id.* (*citing* 42 U.S.C. § 1981a(b)(3)).

■ In order to certify a pattern-or-practice class under 23(b)(2), the court must assure itself that the injunctive and declaratory relief sought by the plaintiffs predominates over any monetary relief that is also sought. In doing so, the court considers "the evidence presented at a class certification hearing and the arguments of counsel, and then assess whether (b)(2) certification is appropriate in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case." *Id.* at 164 (internal quotation marks omitted). Relevant considerations in determining what relief predominates are: whether "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought;" and whether "(2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Id.*[7] An important concern of this inquiry is to prevent "[i]nsignificant or sham requests for injunctive relief [from] provid[ing] cover for (b)(2) certification of claims that are brought essentially for monetary recovery." *Id.*

### 2. *Disparate Impact Claims*

■ "Like pattern-or-practice disparate treatment claims, disparate impact claims 'are attacks on the systemic results of employment practices.' " *Id.* at 160 (*quoting Segar v. Smith,* 738 F.2d 1249, 1267 (D.C.Cir. 1984)). Disparate impact cases also begin with a *prima facie* case, with statistical proof "occup[ying] center stage" at this point. *Id.* "The statistics must reveal that the disparity is substantial or significant.... Moreover, the statistics must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity. *Id.* (internal citations and quotation marks omitted). If this showing is made, the burden shifts to the defendant who has the opportunity to challenge the plaintiffs' statistics.[8] If those statistics are valid and reliable, however, the defendant may try to show that "the challenged practice or policy is 'job related for the position in question and consistent with business necessity.' " *Id.* at 161 (*quoting* 42 U.S.C. § 2000e–2(k)(1)(A)(i)). "If the employer fails to demonstrate a business justification for the policy or practice, *see* 42 U.S.C. §§ 2000e–2(k)(1)(A)(i), 2000e(m), then the plaintiffs prevail." *Id.* "If the employer succeeds in establishing a business justification ... the burden of persuasion shifts back to the plaintiffs to establish the availability of an alternative policy or practice that would also satisfy the asserted business necessity, but would do so without producing the disparate effect." *Id.*

■ Regarding relief, "[s]hould the plaintiffs succeed in establishing a Title VII disparate impact violation, the court may order prospective class-wide injunctive relief." *Id.* If individual relief is requested, "an inquiry similar to the remedial stage of a pattern-or-practice disparate treatment claim is general-

---

7. *Robinson* explains that a court can allow a Rule 23(b)(2) action to go forward as a class action on the liability phase, and still require notice and opt-out procedures to absent class members (as normally required under Rule 23(b)(3) actions) during the relief phase of the proceedings. *Id.* at 166–67; *see also Latino Officers Assoc. v. City of New York,* 209 F.R.D. 79, 93 (S.D.N.Y.2002) ("To be sure, where compensatory damages are involved class homogeneity may falter and adequate representation alone may not suffice to safeguard absent class members' interests. Should class cohesion falter at the remedial stage of this case, it would be appropriate for the Court to afford notice and opt-out rights to absent class members. But at this stage of the case, the Court finds that absent class members'

interests are protected."). As discussed below, the court will assess whether such procedures are needed should a remedial phase be reached.

8. "This may be done by introducing evidence to show that either no statistically significant disparity in fact exists or the challenged practice did not cause the disparity. To successfully contest the plaintiffs' statistical evidence, however, the employer has to convince the factfinder that its numerical picture is more accurate, valid, or reliable than the plaintiffs' evidence. If the employer is able to do so, it prevails and the case ends." *Id.* at 161 (internal citations, quotation marks and alterations omitted).

ly required." *Id.* Back pay and front pay are considered to be individual equitable relief. *See id.* at 160 ("If the employer is unable to establish a lawful reason for an adverse employment action, the employee is entitled to individualized equitable relief, which may include back pay and front pay."). "Each class member must show that he or she was among those adversely affected by the challenged policy or practice. If this showing is made, the class member is entitled to individual relief unless the employer in turn can establish by a preponderance of the evidence that a legitimate non-discriminatory reason existed for the particular adverse action." *Id.* at 161–62.

## III. THE INTERVENORS' MOTION FOR CLASS CERTIFICATION

The Intervenors have brought a disparate impact case, mirroring that brought by the Federal Government, and have added a pattern-or-practice disparate treatment component. Their disparate treatment case alleges that Defendants' "continued reliance on and perpetuation of" hiring practices with a disparate impact constituted intentional race discrimination. (*See* Intervenors Compl. ¶ 51, 56.) The parties have agreed that the case will proceed first to the liability phase for the disparate impact claims, then, if liability is shown, to the liability phase for the disparate treatment claim. Finally, if it should be necessary, the court will conduct a remedial phase.

In their Memorandum of Law, Defendants have opposed class certification principally on three grounds: first, they argue that the proposed class definition is overbroad; second, they argue that certification is unnecessary because of the presence of the Federal Government as a Plaintiff in the case; third, they argue that the Intervenors have not identified an adequate representative for the proposed class. (*See* Defendants' Memorandum of Law in Opposition to Plaintiff–Intervenors' Motion for Class Certification (Docket Entry # 170) ("Def. Opp.").)

As set forth below, the court rejects the majority of Defendants' objections to certification of a class in this case. Moreover, although most of the requirements of Rule 23 go unchallenged, the court makes an independent determination that these requirements have been met. The court begins by discussing Defendants' arguments, and then moves on to address the requirements of Rule 23.

### A. Defendants' Arguments

#### 1. *Overbreadth*

Defendants make several arguments challenging the size and scope of the class proposed by the Intervenors. The court addresses these in turn. First, Defendants argue that numerous employment practices besides those relating to the two challenged written examinations should be excluded from the class definition. For example, Defendants argue that Examination 6019 must be eliminated from the class definition (*see id.* at 6–7), as should the college credit requirement (*id.* at 9–10), and the defibrillation certificate and drivers' license requirements (*id.* at 10). These arguments were offered before the Intervenors moved to amend the Intervenors' Complaint in order to include those practices in the case. Since then, the court has denied Intervenors' request to add these practices (*see* Memorandum & Order dated July 23, 2008 (Docket Entry # 182) ("Amend Order")); accordingly, many of the overbreadth issues discussed in Defendants' brief are moot. The revised definition proposed by the Intervenors excludes these additional employment practices that are not included in the operative Intervenor Complaint.[9] Thus, the court need not consider their effect on the certification question.

■ Second, Defendants argue that the Intervenors' proposed class is overbroad because its inclusion of *all* black applicants necessarily encompasses applicants that are not qualified for the job of entry-level firefighter. Defendants explain that "[a]ppli-

9. Similarly, Defendants argue in their briefing that Examination 7029 must be eliminated from the class because no timely EEOC charge was filed on that examination. (Def. Mem. at 6.) This timeliness argument was rejected in the court's denial of Defendants' Motion to Dismiss and is thus rejected here.

cants must, *inter alia,* pass a physical test, meet the rigid age and medical fitness requirements, as well as pass a drug screening test and background check. A black applicant who is either too old, medically unfit, a convicted felon, a controlled substance abuser, or otherwise unqualified suffers no injury from the alleged discriminatory practice at issue." (Def. Opp. 10–11.) The Intervenors have subsequently addressed this concern by revising their class definition. In their revision, Intervenors have included in the proposed class only those black applicants *harmed* by the allegedly discriminatory employment practices. (*See* Cert. Letter) To the extent that a nondiscriminatory reason was the basis for a particular applicants' failure or delay in being hired, that applicant would not have been harmed by the challenged practices and would not be included in the class.

And, in any case, even if an independent disqualifying factor might provide a nondiscriminatory reasons to reject a particular black applicant, this basis for rejection need not be considered at the liability phase of the proceedings. As the Second Circuit's decision in *Robinson* indicates, *see supra,* the division of class-wide discrimination cases into liability and remedial phases is intended to enable consideration of classwide issues during the liability phase, while leaving issues relating to individual class members for the remedial phase. The "remedial" part of the proceedings specifically includes consideration of "questions of liability [relating to] individual class member rather than to the class as a whole." *Robinson,* 267 F.3d at 158 n. 4. It is at the remedial stage that "[e]ach class member must show that he or she was among those adversely affected by the challenged policy or practice," *Id.* at 161–62, and where a defendant may establish, in individual cases, that there exists "a lawful reason for an adverse employment action," *id.* at 160.

Accordingly, in light of the bifurcation of this case, the issue of classwide discrimination allegedly resulting from the Defendants' uses of Written Examination 7029 and Written Examination 2043 are at issue in the liability phase, whereas the individual qualifications of particular applicants would more appropriately be considered at a remedial stage. Should that stage be reached, Defendant may offer disqualifying reasons relating to particular individuals. Although excluding those who were not harmed by discrimination will limit the class's size, the court will not actually determine which individuals were harmed until the court considers individual issues should it reach the remedial phase.

■ Finally, in terms of overbreadth, the City argues that future applicants for the position of entry-level firefighter should be excluded from the class. This objection is not addressed by Intervenors' revised class definition which seeks to represent "[a]ll future applicants who may be discriminated against in hiring if Defendants are not enjoined from using selection devices and procedures that violate Title VII and State and Local Human Rights." (*See* Cert. Letter 2.) At oral argument, the Intervenors explained that this part of their class definition does not include a request for damages on behalf of future applicants, and thus relates only to equitable and injunctive relief. (*See* Tr. 12, 15–16.)

Inclusion of future applicants is not appropriate in this case. The practices challenged in this case are based upon two written examinations that have already been administered by the City. Future applicants for the position of entry-level firefighter—*i.e.,* who did not sit for Written Examination 2043 or 7029—would not be affected by the challenged practices of City's use of these tests because new examinations are already being administered. The new test, Written Examination 6019, was excluded from the case because its creation and composition differ from that of the two challenged examinations. (*See* Amend Order 6–8.)

Furthermore, inclusion of future applicants would change the focus of the case from the specified individuals who took the challenged examinations to include a large and amorphous range of individuals who are not readily identifiable. In this regard, the court expressed concerned at oral argument over "the difficulty of formulating a class where the membership of that class is so potentially amorphous and/or nondiscrete...." (Tr. 18.)

In accordance with this concern, limiting the class to those who actually took those examinations allows for ready identification of class members and identification of those affected by the employment practices at issue here. As one court has observed, "[t]he class that plaintiffs seek to certify must be readily identifiable so that the court can determine who is in the class, and thus, who is bound by the ruling." *McBean v. City of New York,* 228 F.R.D. 487, 492 (S.D.N.Y.2005). This supports the limitation of the class to those who sat for the examinations whose use is actually challenged in this case.

■ Finally, to the extent that the Intervenors seek to include potential applicants who have been *deterred* from taking the examinations, such a definition would alter the nature of the case before the court. The disparate impact and disparate treatment cases presented here depend upon statistical evidence that the written examinations at issue adversely affected black applicants, evidence that Defendants did not have a valid justification for using the tests, and evidence of an intentional disregard of these facts. Including potential black applicants who did not sit for either examination would likely involve different statistics, and would involve the court in speculation about what particular practices deterred what potential applicants. This is particularly true because potential black applicants might just as easily have been deterred by practices not at issue in this case (*e.g.,* the minimum education requirement or the driver's license requirement.), as by practices that are at issue (*i.e.,* the uses of the challenged examinations). Whether or not Defendants' policies had a deterrent effect on potential applicants, a claim based on deterrence is not presented in this case; the class definition, therefore, should not be extended to include it.

### 2. *Presence of the Federal Government*

■ Defendants argue that certification is unnecessary in light of the presence of the Federal Government which, Defendants argue, seeks "the very equitable relief for which Intervenors request class certification to achieve." (Def. Opp. 14.) More specifically, they argue that because equitable relief is available to the Federal Government, the Intervenors must only have brought their suit for monetary relief, and, therefore, monetary relief must predominate over equitable relief. Because Rule 23(b)(2) requires that injunctive or declaratory relief predominate over monetary relief, they argue, 23(b)(2) certification must be denied. (*See id.* at 14–15.)

The court rejects this line of reasoning. Although the Intervenors are seeking similar injunctive and declaratory relief to that sought by the Federal Government, this similarity does not mean that injunctive and declaratory relief fail to predominate in the Intervenors' case. The Intervenors are private plaintiffs with their own interest in this litigation, and, as such, the Federal Government's case is "both logically and legally distinct from the private suit." *Jefferson v. Ingersoll Int'l Inc.,* 195 F.3d 894, 899 (7th Cir.1999) (recognizing this distinction in case with EEOC intervention). The Federal Government "could dismiss its action or settle . . . on terms that leave the private plaintiffs dissatisfied," *id.,* and the private litigants retain an independent stake in pursuing the claims that they assert. It is therefore appropriate to consider the Intervenors' claims and requested relief separately from the case brought by the Federal Government.

This distinction between the Federal Government's and the Intervenors' respective claims becomes clear when considering the difference in relief sought. The Federal Government asks the court to enjoin the City from engaging in discriminatory practices "against blacks on the basis of race and against Hispanics on the basis of national origin[.]" In particular, it seeks to enjoin the City from:

(1) failing or refusing to appoint, through its open competitive examination process, blacks and Hispanics to the rank of entry-level firefighter on the same basis as whites;

(2) using written examinations as a pass/ fail screening device in the screening and selection of applicants for entry-level firefighters, where the use of such examinations has a disparate impact upon black and Hispanic firefighters, is

**60**

not job related for the position in question and consistent with business necessity[, etc,];

(3) rank-order processing applicants based on a score combined from a written examination, a PPT score, plus bonus points, where the use of such a score has a disparate impact upon black and Hispanic applicants, is not job related for the position in question and consistent with business necessity[, etc,];

(4) failing or refusing to take appropriate action to correct the present effects of its discriminatory policies and practices; and

(5) failing or refusing to "make whole" those black and Hispanic applicants for appointment to the rank of entry-level firefighter who have been harmed by its unlawful use of its written examinations.

(Compl. ¶ 38.) The Federal Government also seeks "such additional relief as justice may require, together with its costs and disbursements in this action." (*Id.*)

The Intervenors also seek equitable and injunctive relief, but the relief sought is broader than that sought by the Federal Government. The Intervenors seek a "class-wide judgment declaring that the acts and practices of Defendants are in violation of the laws of the United States, New York State and New York City," as well as a "permanent injunction requiring Defendants to abolish discrimination on the basis of race and national origin within and among their departments[.]" (Intervenors' Compl., Prayer For Relief ¶¶ 2–3.) In addition, Intervenors ask the court to issue an injunction requiring the Defendants to:

(1) appoint blacks to the rank of entry-level firefighter on the same basis as whites, through the open competitive process of some other process that does not discriminate against blacks;

(2) cease their use of written examinations as pass/fail screening devices in the screening and selection of applicants for appointment to the rank of entry-level firefighter, where such use of the

written examinations results in disparate impact upon blacks;

(3) cease their rank-order processing of applicants for appointment to the rank of entry-level firefighter based on the applicants' combined written examination and PPT scores, plus bonus points, where such use of applicants' combined scores results in disparate impact upon blacks, is not job related for the position in question and consistent with business necessity, etc.;

(4) appoint entry firefighters from among qualified black applicants in sufficient numbers to offset the historic pattern and practice of discrimination against blacks in testing and appointment to that position;

(5) recruit black candidates and implement and improve long-range recruitment programs;

(6) provide to the Intervenors all future test scores, appointment criteria, eligibility lists, appointment data, and all other information necessary to conduct an adverse impact and job-relatedness analysis of the examination and selection process.

(*Id.* ¶ 3.) They also seek an order requiring Defendants to:

(7) reimburse, and make whole those black applicants and those potential black applicants for appointment to the rank of entry-level firefighter who have been harmed by the unlawful use of written examinations, including but not limited to back pay with interest, benefits, and seniority.

(*Id.* ¶¶ 4–5.) Finally, Intervenors also seek the following monetary and other relief:

(8) compensatory damages for the pain, suffering, emotional distress, loss of dignity, humiliation, and damages to reputation and livelihood endured by the Intervenors and members of the class;

(9) punitive damages;

(10) all reasonable attorneys' fees and costs, including expert fees, of this action and ensuring compliance with any order for injunctive relief; and

(11) further relief that the court deems appropriate in the interest of justice. (*Id.* ¶¶ 6–9.) The Intervenors have represented that the monetary relief that they seek would be primarily backpay, which is considered equitable relief. (Tr. 14.)

Based on the foregoing, it is apparent that the scope of relief requested by the Intervenors is different from that requested by the Federal Government, and that this difference is not limited to the monetary relief sought. Whether or not they are entitled to this relief, it is clear that the relief the Intervenors seek is different from that of the Federal Government. Accordingly, the court rejects Defendants' argument that it should decline to consider all the relief requested by Intervenors in determining whether 23(b)(2) certification is appropriate simply because the Federal Government is also seeking injunctive relief. The court will address whether declaratory/injunctive relief predominates when discussing Rule 23(b)(2) below.

### 3. *Class Representation*

#### i. *The Vulcan Society*

■ In opposing class certification, Defendants argue that the Vulcan Society is an inadequate class representative, because, as an organization, it lacks standing to pursue money damages on behalf of class members. (*Id.* at 19–21.) Further, they argue that the Vulcan Society has not suffered the same injury as members of the proposed class, as required for class certification. (*Id.* at 19.) In contending that the Vulcan Society lacks standing to serve as class representative, Defendants rely on *Bano v. Union Carbide Corporation,* in which the Second Circuit stated that " 'whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought.' " 361 F.3d 696, 714 (2d Cir. 2004) (*quoting Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). *Bano* found no appellate-level case allowing an association "to pursue damages claims on behalf of its members," but recognized that there may be standing to pursue the claims of an association's members when "the association seeks a declaration, injunction, or some other form of prospective relief" that, if granted, can reasonably be supposed to "inure to the benefit of those members of the association actually injured." *Id.* (*quoting Warth,* 422 U.S. at 515, 95 S.Ct. 2197). Here, to the extent that the Vulcan Society seeks injunctive and declaratory relief on behalf of black firefighters, such relief can reasonably be supposed to inure to the benefit of those firefighters.

Moreover, the Second Circuit stated in *Bano* that "[t]he organization lacks standing to assert claims of injunctive relief on behalf of its members where the fact and extent of the injury that gives rise to the claims for injunctive relief would require individualized proof, or where the relief requested would require the participation of individual members in the lawsuit." *Id.* at 714 (internal quotation marks, alterations and citations omitted). Importantly, though, because the court has bifurcated the liability and remedial stages of this litigation, the Vulcan Society is in a position to represent the interests of its members for the purposes of the liability phase, during which issues of relief—whether it be injunctive, declaratory or monetary— need not come into play. Pursuant to the procedure set out by the Second Circuit in *Robinson,* the certification for the liability phase allows the court to consider classwide issues of liability before proceeding to consider individualized concerns. At the liability stage, therefore, individualized issues are not presented, and the Vulcan Society is advocating simply for a legal ruling. *See In re Agent Orange Prod. Liability Litig.,* 373 F.Supp.2d 7, 51 (E.D.N.Y.2005) ("an association generally has standing on behalf of its members when its claims raise a 'pure question of law' ") (*quoting Bano,* 361 F.3d at 714). Should there be a remedial phase of the proceedings, however, the court will need to identify individual members of the class to which non-injunctive and non-declaratory benefits would be owed. The court will consider the parties' positions on how to approach this issue should it reach the remedial stage, but at this time, the court perceives no barrier to representation by the Vulcan Society based upon the nature of relief sought.

Moreover, the Vulcan Society's representation of the class based upon the interests of its members is supplemented by injury to itself, coupled with its organizational mission. The Vulcans refer to the observation of the Second Circuit in *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 937 (2d Cir.1968), that "the reasons for requiring an individual plaintiff in a class action to be a member of the class do not necessarily preclude an association from representing a class where its raison d'etre is to represent the interests of that class." The Intervenors rely on this principle to support the Vulcan Society's representative status, and point out that the Vulcan Society's central purpose is consonant with the interests of the class as a whole. Citing extensively from the Affidavit of Captain Washington, the Intervenors argue:

> [T]he Vulcans spend significant resources in terms of time and money to assist and support black applicants or would-be applicants for firefighter positions. The Vulcans play an active role in recruitment and training of potential applicants, and have spent considerable time and money engaging in both litigation and administrative proceedings to protect the interests of both current black firefighters and those who would seek to become firefighters. The Vulcans have also met with City officials and community leaders numerous times to advocate on behalf of the proposed class members. These activities in support of the members of the proposed class are central to the Vulcans' organizational mission, and they are undertaken not only to benefit applicants but also to benefit their

members, the 3% black firefighters who are isolated within an almost universally white department. These incumbent firefighters, Vulcan members, seeks an increase in the numbers of blacks at all ranks within the department and in all firehouses across the City to further their own security, comfort and sense of fairness in their place of employment.

(Intervenors' Reply (Docket Entry # 174) 22.) [10]

Although the Intervenors cite a principle articulated in a forty year-old case, they also point out that courts in this judicial circuit have appointed organizational lead plaintiffs in cases where the organization's purpose is consonant with the interests of the class. For example, in *People United for Children, Inc. v. City of New York*, plaintiffs brought a class action suit to challenge "a number of system-wide deficiencies in [defendant Administration for Children's Services' ("ACS")] administration of New York City's child welfare program." 214 F.R.D. 252, 254–55 (S.D.N.Y.2003). In certifying a class action, the district court permitted an organization that provided "support group meetings for individuals who have lost custody of their children" to serve as a representative for aggrieved parents and guardians. *Id.* at 262. Because the "primary goal" of the organization was to protect the rights of parents to raise their children free from unwarranted government interference, and the majority of its members were black parents with children in the custody of ACS, the court concluded that the organization sufficiently represented the interests of the proposed class.

**10.** In arguing against appointment of the Vulcans as representatives, Defendants rely on another case which invoked the principle articulated in *Norwalk* in a case involving the same organization. Specifically, they rely upon *Vulcan Society of Westchester County, Inc. v. Fire Dep't. of White Plains*, 82 F.R.D. 379, 399 (S.D.N.Y.1979), in which the Vulcan Society sought to be certified as a representative to challenge various discriminatory hiring policies in fire departments in four New York municipalities. In rejecting the Vulcan Society as class representative, the court observed that the organization's "right to sue in its own behalf does not here confer upon it representative status." *Id.* Citing *Norwalk*, the court reasoned that "[t]he direct interests of the association for which protection is sought and to which injury is alleged are different and distinct from the interests of the class for which certification is sought." *Id.* In finding this difference, the court determined that the interests of the Vulcan Society in that case were the "right of association and to obtain dues from potential members." *Id.* at 400 n. 32. These interests, the court observed, were distinct from the interest of class members in obtaining positions as firefighters. The consonance of interest relied upon here is substantially greater than that considered by the court in *Vulcan Society of Westchester County*, and amply supports a determination that "raison d'etre" of the Vulcan Society in this case is to represent the interests of that class.

*See id.* at 263 (*citing Eastern Paralyzed Veterans Assoc., Inc. v. Veterans' Admin.,* 762 F.Supp. 539, 547 (S.D.N.Y.1991)). *See also Civic Assoc. of the Deaf of New York City, Inc. v. Giuliani,* 915 F.Supp. 622, 633 (S.D.N.Y.1996) (finding largest deaf-run organization for advocacy of deaf people in New York City an adequate representative); *Latino Officers Assoc.,* 209 F.R.D. at 91, 94 (certifying organization as class representative for liability phase).

The Vulcan Society has at least as strong an interest in this case as the organizations in these cited cases. Here, the organization has an interest in the injunctive relief sought based upon the interests of its own members, including those whose hiring was allegedly delayed by the rank-order hiring from the challenged written examinations. The organizational mission of the Vulcan Society also aligns with the interests of those who were never hired on account of the challenged practices—and thus never got the opportunity to become black firefighters. The Vulcans have demonstrated years of work and commitment to the increased hiring of black firefighters, including recruitment and training for written examinations. These facts support a determination that the organization will adequately represent the interests of the class as a whole.

■■■■ The touchstone of the adequacy inquiry is whether the interests of the proposed representative conflict with those of the members of the class as a whole. At the liability stage of the litigation—before moving on to determine the appropriate remedial response to any discrimination that might be proved—the court does not perceive any antagonism between the interests of the Vulcan Society and that of the class it seeks to represent. *Cf. Warren v. Xerox Corp.,* No. 01–cv–2909 (JG), 2004 WL 1562884, at *13 (E.D.N.Y. Jan. 26, 2004) ("courts within the Second Circuit have repeatedly certified classes challenging discriminatory policies or practices, despite differing factual circum-

stances of the class members' claims"); *Latino Officers Assoc.,* 209 F.R.D. at 91 ("Absent any reason to find that something other than race is at the root of defendants' alleged discrimination, there is no reason to think that plaintiffs who are members of LOA cannot or will not adequately represent the interests of all class members."). If a conflict develops, the court will reconsider the issue of representation. *Cf. Latino Officers Assoc.,* 209 F.R.D. at 90. In particular, at the remedial stage, in light of possible conflicts in the relief sought, the court will assess the best method of moving forward.

#### ii. *Individual Plaintiffs*

■■■■ Defendants also argue that the Individual Plaintiffs cannot represent the class because they are unfamiliar with the facts of the litigation. (Def. Opp. 21–24.) As courts have held, certification of a representative requires a determination whether a party has "adequate knowledge of the case or 'whether the party is simply lending his name to a suit controlled entirely by the class attorney.'" *People United for Children,* 214 F.R.D. at 264 (*quoting Beck v. Status Game Corp.,* No. 89–cv–2923(DNE), 1995 WL 422067, at *6 (S.D.N.Y. July 14, 1995)). Affidavits have been filed by two of the Individual Plaintiffs demonstrating their knowledge of the practices challenged in this case and their filing of an EEOC charge with the assistance of the Center for Constitutional Rights. (*See* Affidavit of Roger Gregg dated May 8, 2008 (Docket Entry # 145); Affidavit of Marcus Haywood dated June 25, 2008 (Docket Entry # 176).) These affidavits are sufficient to show the knowledge of these two Individual Plaintiffs regarding this litigation, and demonstrate that they are not simply lending their names to the case.[11]

#### iii. *Subclasses*

■■■■ Finally, regarding representation, the Federal Government has raised the pos-

---

**11.** There has been no affidavit submitted by Individual Plaintiff Candido Nuñez. Although Defendants have cited no authority requiring an affidavit from a proposed class representative, as Intervenors point out, based on the absence of any submission relating to him, the court does

not see a sufficient showing that Nuñez overcomes the Defendants' objection that he is an inadequate class representative. Accordingly, the court will not appoint Nuñez as a class representative.

sibility of subclasses to correspond to each of the challenged practices. Under Rule 23(c)(5), "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." The Second Circuit has recognized that subclasses are warranted in order to "focus discovery" by "identifying the specific issues to be tried;" to "weed out, and, if necessary, dismiss those claims for which no named plaintiff is an adequate representative[;]" to "conduct the trial in a more orderly manner, by tying the order of proof to particular claims raised by the individual subclasses[;]" and to "provide the defendants with sufficient notice of the specific charges they face in a timely fashion." *Marisol A.*, 126 F.3d at 379. Given the progression of this case, the conclusion of discovery, the adequacy of representation for liability, and the focus of the court and the parties on specified and discrete practices, these concerns do not give rise to the need for subclasses at this point.

Instead, the argument for utilizing subclasses here is premised upon the potential for the court to reach different conclusions regarding liability for each of the four different employment practices challenged. (*See* Tr. 19 ("it would be possible to prevail with respect, for instance, to the ranking and not the cutoff score claims....").) Because of this possibility, the Federal Government argues that subclasses corresponding to these four practices are warranted.

Although the four challenged practices are alleged as a pattern of related activity, the Title VII case relating to each practice involves its own statistical evidence and different kinds of argument. At this stage, however, it appears to the court that the Vulcan Society—having vigorously prosecuted this action to date, having been deemed an adequate representative to represent the class as a whole, and having interests consonant with members of each subclass—is adequate to represent a class challenging all four practices. Haywood and Gregg, only sat for Written Examination 2043 and passed that examination; however, and, as a matter of typicality, these Individual Plaintiffs should represent those who also sat for and passed that examination—*i.e.*, all black firefighters

of firefighter applicants who were harmed by Defendants' rank-order processing of applicants who passed Written Examination 2043. A subclass will be created relating to that employment practice for which Haywood and Gregg may serve as representative.

As previously determined, should a conflict among the interests of class members covered by the different practices arise, the court will reconsider the issue of whether the Vulcan Society may adequately represent them all. In particular, certification will be revisited at the remedial stage on account of this concern. *See* Fed.R.Civ.P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *cf. Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 254 (S.D.N.Y.2003) ("there is no need to appoint multiple Lead Plaintiffs in order to represent different causes of action when subclasses or separate representatives may be appointed, if necessary, as the litigation proceeds"). At any remedial stage, it may be appropriate for the court to provide notice to class members to allow them to "come into the action," to the extent they may be willing and able to serve as representatives for possible subclasses relating to the four challenged practices. *See* Fed.R.Civ.P. 23(d)(1)(B)(iii) (allowing the court to order notice to class members of opportunity to "signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action"); *cf. Link v. Mercedes–Benz of North America, Inc.*, 788 F.2d 918, 929 (3d Cir.1986) ("If the class representatives did not adequately represent the subclass, the proper remedy was to amend the class certification order or to permit additional plaintiffs to intervene."). The court has already expressed concern for possible conflicts relating to the remedial stage, and should there be a finding of liability, the court will need to take steps to address those concerns before proceeding to the remedial stage.

### B. Rule 23 Requirements

Although most of the requirements go unchallenged, the court must conclude that

class certification is appropriate under all the requirements of Federal Rule 23. As set forth below, the court concludes that certification is appropriate.

### 1. *Numerosity*

■ "Rule 23(a)(1) requires that the class be so numerous that joinder of all its members is impracticable." *Latino Officers Assoc.*, 209 F.R.D. at 88. According to the Intervenors' expert, data files provided by the City indicate that 1,749 black applicants sat for Written Examination 7029 in 1999, and 1,393 black applicants sat for Written Examination 2043 in 2002. (*See, e.g.*, Affidavit of Joel P. Wiesen, Ph.D. dated April 9, 2008 (Docket Entry #123), Ex. A, at 5.) Defendants do not contest the satisfaction of this requirement, and the court concludes that numerosity is met.

### 2. *Commonality*

■ "Rule 23(a)(2) requires that there be questions of law or fact common to the class. The commonality requirement is satisfied 'if plaintiffs' grievances share a common question of law or of fact.'" *Latino Officers Assoc.*, 209 F.R.D. at 88 (*quoting Marisol A.*, 126 F.3d at 376). District courts have found common issues when plaintiffs' challenges to citywide policies have been based upon municipal policies or practices allegedly giving rise to classwide discrimination. *See, e.g., id.* at 88 ("Resolution of plaintiffs' claims undeniably will involve common questions of fact or law. These include whether the NYPD's facially-neutral disciplinary system results in disparate treatment of African–American and Latino NYPD officers . . . ."); *Gulino v. Bd. of Educ.*, 201 F.R.D. 326, 331 (S.D.N.Y.2001) (commonality requirement met when questions "at the heart of this suit" included whether "defendants' use of [standardized certification] tests violates Title VII of the Civil Rights Act of 1964" under disparate impact theory).

Defendants do not appear to contest the commonality issue, and Intervenors have offered numerous common issues on which they claim certification is appropriate. During the liability phase of the proceedings, common issues before the court include:

whether Defendants' uses of Written Examination 7029 and Written Examination 2043 had a disparate impact upon black applicants for the position of entry-level firefighter; whether Defendants' uses of those examinations were job related to the position in question and consistent with business necessity; whether alternative practices that satisfy the asserted business necessity without disparate effect are available; and whether Defendants engaged in a pattern or practice amounting to intentional discrimination. The Intervenors' case will be based upon statistical and anecdotal evidence that, they argue, will show the disparate impact and treatment of black firefighters. *Cf. Warren*, 2004 WL 1562884, at *10 ("where, as here, plaintiffs' statistical and anecdotal evidence tends to show that being a member of a racial minority has a negative effect on compensation, that showing suffices to demonstrate a common question of fact concerning defendant's employment practices, within the meaning of Rule 23(a)"). The court concludes that the commonality requirement of Rule 23(a)(2) is satisfied.

### 3. *Typicality*

■ "Rule 23(a)(3) requires that the claims of the class representatives be typical of the claims of the class." *Latino Officers Assoc.*, 209 F.R.D. at 89. "Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir.1993). Defendants do not appear to contest the typicality requirement. At least as far as the liability phase is concerned, the legal theories relied upon and the factual basis for the Intervenors' claims arise from the same course of events and similar legal arguments as the proposed class members. The proposed class members "have the same or similar injury," and their action "is based on conduct not special or unique to the named plaintiffs." *Latino Officers Assoc.*, 209 F.R.D. at 89 (*quoting Dura–Bilt Corp. v. Chase Manhattan*, 89 F.R.D. 87, 99 (S.D.N.Y.1981)). Ac-

cordingly, the court concludes that the typicality requirement is met.

### 4. *Adequacy of Representation*

■ The final requirement of Rule 23(a) is that "the representative party will fairly and adequately protect the interests of the class." *Latino Officers Assoc.*, 209 F.R.D. at 90. This requirement demands that a proposed representative's interests not be "antagonistic to the interest of other members of the class" and that the representative's attorneys be "qualified, experienced and able to conduct the litigation." *Cordes & Co. Financial Services*, 502 F.3d at 99 (internal quotation mark omitted). Here, there is no dispute that Intervenors' attorneys are qualified to conduct this litigation, but, as discussed above, the parties dispute the adequacy of representation on antagonism grounds. When it comes to determining whether interests are antagonistic, "[a] conflict or potential conflict alone will not ... necessarily defeat class certification-the conflict must be fundamental." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir.2006). As the discussion above sets forth, the court concludes that a fundamental conflict does not exist here, and that the Vulcan Society, Marcus Haywood, and Roger Gregg are adequate class representatives.

### 5. *Rule 23(b)(2)*

■ As discussed above, to certify the class action under 23(b)(2), the court must assure itself that the injunctive and declaratory relief sought by the plaintiffs predominates over any monetary relief that is also sought. In doing so, the court "must consider the evidence presented at a class certification hearing and the arguments of counsel, and then assess whether (b)(2) certification is appropriate in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case." *Robinson*, 267 F.3d at 164 (internal quotation marks omitted). Relevant considerations in determining what relief predominates are whether: "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought;" and whether "(2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Id.*

■ Having considered these factors, the evidence presented and the argument of counsel, the court concludes that the injunctive and declaratory relief sought by the Intervenors predominates over the requested monetary relief. The court concludes that the Intervenors would have brought this suit even in the absence of monetary relief. And, the history of the Vulcan Society's involvement with the underrepresentation of black firefighters and their ongoing efforts relating to the written examinations and testing process demonstrate the importance to Intervenors of such relief. (*See* Washington Aff. ¶¶ 3, 5, 7, 18–28.) And, if the Intervenors succeed on the merits of their claims, it would be "reasonably necessary and appropriate" as a remedy to award injunctive or declaratory relief, such as a declaration that the challenged employment practices of the City are unlawful, an injunction requiring the City to appoint black candidates on the same basis as white candidates to the position of entry-level firefighter, or an injunction preventing the City from using written examinations as a pass/fail screening device or for rank-ordering processing in a manner that results in a disparate impact in violation of Title VII. Although the court does not make a determination about the appropriate relief at this stage, other forms of injunctive relief might also be appropriate, such as the requested recruitment program for black firefighters, the requested steps to appoint additional qualified black applicants, or the requested steps to monitor the City's compliance with Title VII.

In this regard, the court reaches a similar conclusion to that of Judge Kaplan in *Latino Officers Association*:

> The Court finds that the positive value to the plaintiffs of the injunctive and declaratory relief sought is predominant. It is likely that plaintiffs would have brought this suit even in the absence of the potential for monetary recovery by some plaintiffs. The class seeks a declaration that the acts and practices of the NYPD are

illegal. Plaintiffs seek also injunctive relief in the nature of, *inter alia,* an independent monitor, training, a revamping of the NYPD disciplinary system, and back pay. The injunctive relief sought here is quite significant. While plaintiffs do ask for monetary damages, the qualitative value of the declaratory and injunctive relief they seek overwhelms these requests for damages. 209 F.R.D. at 93. Similarly, here, the courts finds that the "positive" and "qualitative" value of the injunctive relief is predominant. Should the Intervenors prevail, the court would not lightly discount the paramount importance to them of a declaration that the policies of Defendants perpetuated unlawful discrimination, of a permanent injunction against discrimination, or of the various other forms of injunctive relief they request. Moreover, it is hard to conceive more significant injunctive relief than the request for steps toward the appointment and granting of seniority to black firefighters as a remedy for the alleged discrimination. In this regard, the court concludes that the predominant relief that is sought is injunctive or declaratory.

Moreover, although money damages are part of the Intervenors' requested relief, this does not preclude certification at the liability stage of the proceedings. As the Second Circuit in *Robinson* made clear, any issues raised by the request for monetary relief for particular individuals can be addressed at the remedial stage of litigation. In doing so, the Second Circuit observed that "certification of a claim for non-incidental damages under Rule 23(b)(2) poses a due process risk because this provision does not expressly afford the procedural protections of notice and opt out," but went on to explain that "any due process risk posed by (b)(2) class certification of a claim for non-incidental damages can be eliminated by the district court simply affording notice and opt out rights to absent class members for those portions of the proceedings where the presumption of class cohesion falters—*i.e.,* the damages phase of the proceedings." 267 F.3d at 166. Accordingly, "for those stages of this case where the interests of the class members are essentially identical (i.e., the liability phase of the pattern-or-practice suit and the class-wide phases of the disparate impact claim), the due process rights of absent class members are ensured by adequate class representation alone." *Id.* at 167 n. 10.

This due process risk is minimized here by the cohesiveness of the class. "At base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness .... Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries. The members of a(b)(2) class are generally bound together through 'preexisting or continuing legal relationships' or by some significant common trait such as race or gender." *In re Rezulin Prod. Liability Litig.,* 210 F.R.D. 61, 75 (S.D.N.Y.2002) (*quoting Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 143 n. 18 (3d Cir.1998)). The proposed class of black applicants who sat for the challenged written examinations are bound together in just this way, and the cohesiveness of the 23(b)(2) class at the liability stage is sufficiently strong for the court to certify for that stage of these proceedings.

## IV. CONCLUSION

Based on the foregoing, the court deems certification appropriate and GRANTS the Intervenors' motion to the extent set forth herein. The court certifies the following class:

All black firefighters of firefighter applicants who sat for either Written Exam 7029 or Written Exam 2043 were harmed by one or more of the following employment practices:

(1) Defendants' use of Written Exam 7029 as a pass/fail screening device with a cutoff score of 84.75;

(2) Defendants' rank-order processing of applicants who passed Written Exam 7029;

(3) Defendants' use of Written Exam 2043 as a pass/fail screening device with a cutoff score of 70.00; and

(4) Defendants' rank-order processing of applicants who passed Written Exam 2043.

This class is certified for the liability phase of the disparate treatment and disparate impact claims asserted by the Intervenors. The Vulcan Society shall serve as representative as the class as a whole for the purposes of the liability phase of the proceedings; Marcus Haywood and Roger Gregg will serve as representatives for a subclass that includes black applicants who were harmed by Defendants' rank-order processing of applicants who passed Written Examination 2043.

The certification decision depends in large part upon the bifurcated proceedings in this case. If the court reaches the remedial stage, it will revisit its class certification decision in order to determine the most expedient method of going forward, including consideration of notice and opt-out procedures, as well as consideration of whether subclass representatives are needed. *See Warren,* 2004 WL 1562884, at *16 ("If liability is found, the certification issue may be revisited in connection with the damages phase."); *see also Robinson,* 267 F.3d at 171 ("the preferable course is for the district court to revisit the question of the Class Plaintiffs' 'fitness' to represent the class if and when the individual-relief stages of the claims occur").

SO ORDERED.